# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 7, 2013

## STATE OF TENNESSEE v. JERMAINE OWENS

**Appeal from the Criminal Court for Shelby County**
**No. 09-04257   Lee V. Coffee, Judge**

---

**No. W2012-00054-CCA-R3-CD  - Filed August 5, 2013**

---

The Shelby County Grand Jury indicted Appellant for two counts of especially aggravated kidnapping, one count for each victim; two counts of especially aggravated robbery, one count for each victim; and two counts of aggravated rape.  At the conclusion of a jury trial, Appellant was found guilty of all counts.  The trial court sentenced Appellant to an effective sentence of 125 years.  On appeal, Appellant argues that the trial court erred in denying his motion to suppress his identification in the photographic lineup presented to one of the victims, that the evidence was insufficient to support his convictions, and that the trial court erred in imposing consecutive sentences.  After a thorough review of the record, we conclude that the trial court did not err in denying the motion to suppress the line-up results or imposing consecutive sentences. Further, we hold that the evidence was sufficient to support his convictions.  Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the appellant, Jermaine Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Ray Lepone, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

On the evening of December 28, 2008, the victims, JH1, a female, and JH2[1], a male, attended a Christmas party at the skating rink in Cordova, Tennessee. JH1 and JH2 were co-workers at the Outback Steakhouse in Cordova. Alcohol was not served at the party, but the attendees could bring their own. JH2 and JH1 left the party about 3:00 a.m. in JH2's brother's Lincoln Aviator. They soon got lost. They stopped at a gas station where JH1 began driving the car. Shortly thereafter, they arrived at the parking garage attached to JH1's apartment building. JH1 was smoking a cigarette in the vehicle with the window slightly open.

As JH1 and JH2 were getting ready to exit the vehicle, two men with guns appeared on either side of the vehicle. They had sweatshirts wrapped around their heads in an attempt to obscure their faces. They ordered JH1 and JH2 out of the vehicle and told them to lie face down on the ground. The gunmen demanded that the victims give them everything in their pockets. The victims complied.

After demanding that one of the victims lie on top of the other victim, the gunmen left. The victims remained on the ground. They thought the crime was through. However, the gunmen returned and ordered the victims back into the car. The gunmen placed JH1 in the front seat and JH2 in the back seat behind her. One of Appellant's co-defendants, Rarlo Primes, drove the vehicle. The second gunman, James Hamilton, was in the backseat with JH2. The gunmen told the victims to keep their heads down. At some point, they stopped and a dark SUV pulled up to the driver's side of the vehicle. The driver of the dark SUV was talking to Mr. Primes.

The victims were driven to a field about twenty minutes away from JH1's apartment. When they arrived at the field, the victims were pulled out of the vehicle. The assailants made JH2 and JH1 take off their shoes and some of their clothes.

JH1 was taken away from JH2. They put him on the ground and asked him what his PIN was for his credit card. JH2 did not know the number. When he told them he did not know it, one of the gunmen began hitting JH2 in the side of the face and the back of the head with a gun. JH2 said that when he told them something they did not like, they beat him.

---

[1] Because of the nature of the crimes, we will refer to the victims by their initials.

Eventually, JH2 gave them a fake PIN. Initially he heard just the two voices of the individuals in the truck, but later he heard a third voice.

Apparently at some point, one individual took JH2's credit card and attempted to use it. The individual was very angry when he returned from the ATM. He shot JH2 in the back and said, "See. See I'm not playing." The person who shot him was the third voice. JH2 stated that the third person hit him the most. The assailants also urinated on JH2's head. At some point, JH2 lost consciousness.

JH1 testified that when they arrived at the field, she was taken away from JH2 and did not see him again for about an hour. She also stated that she did not see or hear Mr. Primes while she was in the field. There was a third gunman at the field. She was not sure when or how he arrived. She identified the third person in the field as Appellant. According to JH1, she did not come into contact with Appellant until they got to the field. She testified that Appellant seemed to be the gunman in charge. She said he ordered that her shirt be taken off and orchestrated the events of the evening.

Appellant had JH1 on the ground while he hit her in the face with a gun. She stated that Appellant was the one beating her. Although it was dark, she stated that she was very close to him several times and could identify him. JH1 stated that when the ordeal in the field began, Appellant was wearing a bandana but later on he was not wearing it anymore.

JH1 testified that she was "crying and crying." Mr. Hamilton yelled at her and told her to stop crying. He forced JH1 to perform oral sex while he held a gun to her head. He did not ejaculate. She stated that Mr. Hamilton did not hit or beat her. JH1 stated that Mr. Hamilton did not seem eager to participate in the rape. When Appellant was away from her, Mr. Hamilton told her that she was going to be okay.

Appellant returned when JH1 was on her knees without her shirt. She said that she was bleeding and in pain. In addition to being beaten repeatedly in the face with a gun, one of the gunman stomped on her hands. She was looking down, so she could not identify who it was. She was also stepped on and kicked in the back. Appellant forced her onto her back and ordered her to take off her pants. She attempted to comply with his demand, but Appellant became impatient and ripped off her pants. She pleaded with Appellant to stop. Because Appellant hit her every time she begged, JH1 stopped begging. Appellant told her to "shut up" or he would kill her. Appellant did not take his pants off, but instead pulled his pants down enough to rape her vaginally with his penis. Appellant also attempted to insert his fingers in her anus. Throughout the vaginal and anal rape, Appellant either had the gun at the victim's head or laid down on the ground depending upon what he was doing. The victim did not know if Appellant ejaculated.

After about an hour of assaulting the victims, the three gunmen placed JH1 in the driver's seat and JH2 in the passenger seat of the Lincoln. JH2 regained consciousness in the Lincoln. He said blood was pouring off of his face, and he saw JH1 sitting next to him in the driver's seat. JH2 said that JH1 was bleeding. JH1 had blood all over her face. The gunmen told the victims to keep their heads down or they would kill them, and the assailants drove off in the dark SUV.

JH2 retrieved two jackets from the back of the vehicle and gave one to JH1. JH1 tried to drive away, but the car was stuck. JH2 had to get in the driver's seat, and JH1 got out and pushed the Lincoln from behind. They did not know where they were. The victims could see the big buildings of the Memphis skyline, so they drove in that direction. They eventually found the Methodist University Hospital.

JH2 was let in the emergency entrance. JH1 went to the front entrance. JH2 did not see JH1 again once they got to the hospital. JH2 said that he was attempting to tell the hospital employees what happened when he began to throw up blood. He was taken into surgery. The doctors were not able to remove the bullet. JH2 was at the hospital for eighteen days.

At trial, JH2 testified that his wallet, ATM card, cell phone, and the in-dashboard DVD navigation system were all taken from him. There was a gun pointed at him throughout the ordeal. JH1 testified that her purse and its contents, cell phone, and twenty-first birthday ring were taken.

Nurse Pam Preston testified that she worked with the Memphis Sexual Assault Resource Center. She examined JH1 the morning of the incident. She stated that JH1 was "sad, trembling, tearful, and beaten" Ms. Preston testified that JH1 was disheveled. Throughout the examination, JH1 was in pain and was sobbing. Ms. Preston testified that the victim had multiple, visible injures, including lacerations on both hands, swelling in the right hand, an abrasion on the left side of her back, bruising of the right hip and buttock, bruising and laceration of both eyes, lacerations of the right cheek and chin, bruising and redness of the left jaw and neck, laceration of the scalp, and laceration and bruising of the inner and outer lips.

JH1 told Ms. Preston that she had been raped orally, vaginally, and anally by two different perpetrators. They did not use condoms. The victim did not know if the perpetrators had ejaculated during the rapes. JH1 sustained an injury to the inside of her mouth that is specific to a forced oral rape. Ms. Preston took swabs from the victim's body parts where she was assaulted. She prepared slides to determine if semen was present. There

was not. At the conclusion of the examination, Ms. Preston prepared a report. She determined that sexual assault was suspected and that JH1's level of injury was extreme.

Lieutenant Ryan Thomas with the Memphis Police Department was the case coordinator. He tracked JH1's cell phone to an address. An officer proceeded to the address in question and located JH1's cell phone. Mr. Hamilton was present at the address. The officer arrested him.

Mr. Hamilton gave a statement to Lieutenant Thomas. He admitted that he participated in the robbery of JH1 and JH2. As a result of this interview, Lieutenant Thomas and several other officers went to an address in Memphis. When they arrived at the address, the officers knocked on the door. Appellant answered the door and let them into the home. The officers took Appellant into custody. They also recovered a black Tahoe that they discovered belonged to Appellant's cousin. Within a day of the crime, Mr. Hamilton, Appellant, and Mr. Primes had all been arrested.

After advising Appellant of his Miranda rights, Appellant waived his rights. Lieutenant Thomas interviewed Appellant regarding the evening in question. Initially, Appellant denied any involvement with the crimes. Lieutenant Thomas confronted Appellant with a photograph of Appellant at a First Tennessee Bank attempting to use JH2's ATM card. This location was less than five minutes from the field. Appellant changed his story. He stated that Mr. Primes and Mr. Hamilton called him to pick them up at a parking garage. He said he circled the garage and that the other two men ran out of the garage. After getting in the Tahoe, Appellant said the two men decided to return to the garage. He said that he asked Mr. Primes for some gas and that Mr. Primes gave him some credit cards and codes that did not work. Appellant said that he drove to the field and the two men jumped out of the Tahoe. Appellant said he drove off and was not involved with the incident other than driving the Tahoe.

On July 9, 2009, the Shelby County Grand Jury indicted Appellant, Mr. Hamilton, and Mr. Primes for two counts of especially aggravated kidnapping, one count for each victim; two counts of especially aggravated robbery, one count for each victim; and two counts of aggravated rape.

On March 1, 2010, Appellant filed a motion to suppress a photographic lineup that occurred the day before the preliminary hearing. After a hearing on the motion, the trial court denied the motion. A jury trial was held from August 22, 2011, to August 27, 2011. At the conclusion of the trial, the jury found Appellant guilty of two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and two counts of aggravated rape.

On September 30, 2011, the trial court held a separate sentencing hearing. The two rape convictions were merged into one another, and Appellant was sentenced to twenty five years at 100 percent for each conviction, resulting in five twenty-five-year sentences. The trial court ordered that the sentences be served consecutively to each other. Appellant's effective sentence is 125 years to be served at 100 percent.

Appellant appeals his convictions and sentence.

## ANALYSIS
### Motion to Suppress

On appeal, Appellant argues that the trial court erred in denying his motion to suppress the photographic lineup because "his photograph was emphasized in the array because of the difference in clothing worn made the Appellant stand out unnecessarily and with prejudice." The State disagrees.

Initially, we point out that Appellant's brief states that the trial court should have granted his motion to suppress "the Photo Lineup and *subsequent identifications*." (emphasis added). However, Appellant's argument, citations to the record, and citation to authority only addresses the photographic lineup. Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Sanders*, 842 S.W.2d 257, 259 (Tenn. Crim. App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint). Therefore, we will only address the identification issue with regard to the out-of-court photographic lineup.

In reviewing a trial court's denial of a motion to suppress, this Court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). However, the law as applied to those facts is subject to de novo review. *Id.* Appellant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *State v. Odom*, 928 S.W.2d 18, 22-23 (Tenn. 1996).

At the suppression hearing, Lieutenant Ryan Thomas with the Memphis Police Department testified that he was the case coordinator of the case at hand. As a result of his

investigation, he developed a suspect by the name of James Hamilton. Mr. Hamilton's statements led to the arrest of Appellant. Lieutenant Thomas interviewed both victims at the hospital immediately after the incident. He showed JH1 photographic lineups from which she identified Mr. Primes and Mr. Hamilton. JH1 was never shown a photographic lineup from which to identify Appellant. This was an inadvertent mistake on the part of the police department. In February 2009, immediately before Appellant's preliminary hearing, the oversight was discovered. Lieutenant Thomas testified that he used a computer program called "Mug Shots" to help create a photographic lineup with similar photographs. JH1 was in the lobby of the courthouse on February 23, 2009, before the hearing, and Lieutenant Thomas took her to a room where he showed her a photographic lineup. JH1 immediately identified Appellant and circled his picture.

JH1 testified at the hearing about her ordeal. She stated that they were in the field for around an hour and she was raped multiple times by Appellant and one of the co-defendants. She stated that although it was dark, she saw Appellant up close and was able to identify him. JH1 stated that before the photographic lineup, she viewed Appellant's picture at the Shelby County Jail kiosk online. She said she looked because she feared for her safety and was concerned that the defendants would be released. JH1 stated that if one of the individuals who had been arrested for the crime was not involved, she would have called the police immediately. She also stated that viewing the photograph online did not effect her identification of Appellant in the photographic lineup shown to her in February.

At the conclusion of the hearing, the trial court denied the motion to suppress the photographic identification.

### Out-of-Court Identifications

Out-of-court eyewitness identifications as well as in-court identifications may be challenged on constitutional grounds. A defendant's right to due process is violated if, under the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384 (1968); *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *see also State v. Strickland*, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Examples of impermissibly suggestive identification procedures include:

That all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.

*United States v. Wade*, 388 U.S. 218, 233 (1967) (footnotes omitted).

Although an identification procedure might be unnecessarily suggestive, the ensuing identifications may be admissible at trial if the identification was nonetheless reliable. *Neil*, 409 U.S. at 199-201. The factors to be considered in determining the reliability of the identification include:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199; *see State v. Edwards*, 868 S.W.2d 682, 695 (Tenn. Crim. App. 1993).

The trial court made the following findings at the conclusion of the hearing on the motion to suppress:

The motion alleged that [Appellant] is dressed a little bit differently, that the photograph is significantly different from other defendants, and the Court, for the record, has reviewed the photographic display, and the Court finds that there may be some differences in the appearances of [Appellant] and other defendants, namely, that he does not appear to have anything white on under his shirt. Lt. Thomas testified that his photographic display was put together by Mug Shot program, and certain criteria is put in, and they try to get descriptions that are as close to each other as possible.

. . . .

The Court finds the process for this photographic display is not overly suggestive. The only difference in this photographic display is that [Appellant] does not appear to have anything white on or under the dark colored shirt that he does [have]. All these people have facial hair. All these folks have either twists or dreads.

. . . .

The other issue on the identification process is [JH1] has indicated that she wanted to make sure that the people that had committed this rape against her, this robbery, this kidnapping, were, in fact, still in custody, so she, on her own, without any prompting from anyone, not any advice, not any prompting from the Attorney General's office or any law enforcement agencies, that she wanted to make sure that the folks that committed this crime against her were still in jail and that she went to that kiosk many times. She has also told the Court that if she recognized that the three people that were arrested and charged for this crime against her, if one of these folks had been wrongfully charged, she wanted to make sure that she would let [the police] know because she would not want an innocent person in jail. Those were [JH1's] words.

. . . .

What she told the Court on direct examination is that she is not identifying [Appellant] in Court today because of her identification in the lineup or because of what she saw on the kiosk. She has told the Court that she is making this identification based on her own recollection of [Appellant] pointing a gun at her, threatening to kill her and raping her in a field, and the Court does find that this identification in Court is of an independent origin and [JH1] is not making this identification based on her viewing of [Appellant] in a photographic display or viewing him on a kiosk on many different occasions.

. . . .

And this Court finds, for the record, that the out-of-court identification in which [JH1] identified [Appellant] in a photographic display, that there is nothing impermissibly suggestive about the six photographs that are contained here, and the fact that she may have seen [Appellant's] – did see [Appellant's] picture in the Shelby County kiosk on many different occasions has nothing to do with her identification of [Appellant]. Her identification in Court is of an

independent origin in which she told the Court that she is identifying [Appellant] because of what he and others did to her on December 28, 2008.

We conclude that the evidence in the record does not preponderate against the trial court's findings. As stated by the trial court, the only miniscule difference is that Appellant was wearing a solid dark-colored shirt and the other individuals are wearing dark-colored shirts with either white trim or a white t-shirt barely visible underneath. This small difference alone is not enough to make the photographic lineup unduly suggestive. The photographic array depicted six African-American males of similar age with similar facial characteristics, facial hair, hair color, hair style and hair length.

Moreover, even if the lineup had been suggestive, we find the victim's identification of Appellant to be nonetheless reliable. The victim testified that the incident lasted about an hour. She also stated that Appellant was very close to her several times enabling her to view Appellant during the incident. Therefore, she had ample opportunity to observe Appellant. Only two months had passed between the incident and the photographic lineup and identification. Also, Lieutenant Thomas and the victim testified to her certainty when she identified Appellant. Therefore, we agree with the trial court's assessment that the victim's viewing of the photograph online did not taint her identification under the totality of the circumstances. Under these circumstances, we find the victim's identification of Appellant reliable. Appellant is not entitled to relief on this issue.

## Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his convictions for especially aggravated kidnapping, especially aggravated robbery, and aggravated rape because the evidence could not establish Appellant's identity. Appellant does not argue that any of the elements for the crimes have not been met, therefore, we will address only the issue presented regarding identity.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate

the insufficiency of the convicting evidence. *Bland*, 958 S.W.3d at 659; *Tuggle*, 639 S.W.2d at 914.

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

The identification of a defendant is a question of fact for the determination of the jury after consideration of the proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). The jury obviously accredited JH1's testimony herein to establish Appellant's identity. Furthermore, there was a photograph of Appellant attempting to use JH2's ATM card at a First Tennessee Bank that was located less than five minutes from the crime scene. Agent Nelson also stated that a DNA sample taken from the Lincoln was a mixture of genetic material and Appellant was the major contributor. The evidence was sufficient to support the convictions. Appellant is not entitled to relief on this issue.

## Sentencing

Appellant's final issue on appeal is that the trial court erred in imposing consecutive sentences. The State disagrees.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *See State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 705 n.41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, under *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one offense, the trial court shall order the sentences to run either consecutively or concurrently. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . . .

T.C.A. § 40-35-115(b)(2), (4). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

As stated above, this section also permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. *See Imfeld*, 70 S.W.3d at 708-09; *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995).

Appellant argues that the trial court erred in imposing consecutive sentences based upon the determination that Appellant is a dangerous offender. The trial court first determined that Appellant was subject to consecutive sentencing based upon the conclusion that Appellant's criminal record was extensive. The trial court then stated the following:

> [B]ased on the facts and circumstances of this offense alone, the Court- and in this case the Court does find that [Appellant] is a dangerous offender and he had no hesitation in committing a crime in which the risk to human life was high. He did everything but kill these two people. He shot a peson in the back and if he had not gotten immediate attention [JH2] may have very well died. He did everything to [JH1] except kill her and [JH1] has told the Court in this letter that she has submitted to the Court that she doesn't know that whether or not death may have been preferable, but she's glad that she's alive, but she could have easily been killed.
>
> These are two people that were abducted, taken to a location where they had no idea where they were, taken to an abandoned field and raped and

brutalized and beaten and stomped and kicked and urinated on for over an hour. And this Court does find that the circumstances surrounding the commission of this offense are aggravated. And that the length of sentences reasonably relates to the severity of the offenses for which the defendant stands convicted and that consecutive sentences in this case are necessary to protect the public from future acts of the defendant. And that's language from State versus Wilkerson. This case is stated in the Court's finding in this case and the Court does find that all these factors apply.

In the case at hand, the trial court did made extensive findings based on *Wilkerson* prior to applying consecutive sentencing based upon Appellant being a dangerous offender. We conclude that these findings were sufficient to support the imposition of consecutive sentences.

Furthermore, the trial court also relied upon its conclusion that Appellant's record of criminal history was extensive. Appellant was twenty-seven at the time he committed the crime. At the age of nineteen he was convicted of his first felony, theft of property, and placed on diversion. A year later he was charged with disorderly conduct and pled guilty. The next year he was charged with simple assault to which he pled guilty and was sentenced to one day. At the age of twenty-two he was charged with domestic violence for which he pled guilty to simple assault. He was also charged with various traffic offenses. At the age of twenty-three, he was charged with possession of marijuana and various traffic offenses. He was also charged with domestic violence, to which he pled guilty and received a sentence of forty-five days. He was also charged with promoting prostitution. At the age of twenty-four Appellant was charged with driving with a suspended, cancelled, or revoked license; possession of marijuana, and disorderly conducted. At the ages of twenty-five and twenty-six, he was charged with three separate charges of indecent exposure with a victim thirteen years old or older. He was also charged with simple assault at the age of twenty-six. These charges resulted in seven felony convictions. Appellant was charged with at least one criminal charge each year from the age of nineteen leading up to the charges at hand. We consider this an extensive criminal record in a short period of time.

As stated above, the trial court only needs to find that one of the criteria set out in Tennessee Code Annotated section 40-35-115(b) exists. We conclude that there is ample evidence to support either criteria cited by the trial court.

Therefore, Appellant is not entitled to relief on this issue.

**CONCLUSION**

For the foregoing reasons, we affirm the judgments of the trial court.


_____
JERRY L. SMITH, JUDGE